Troy A. BECKLER, Appellant,

v.

**NORTH DAKOTA WORKERS COM-
PENSATION BUREAU, Appellee.**

Civ. No. 870145.

Supreme Court of North Dakota.

Feb. 1, 1988.

Dietz & Little, Bismarck, for appellant; argued by Kathryn L. Dietz. Appearance by Stephen D. Little.

Dean J. Haas (argued), Asst. Atty. Gen., N.D. Workers Compensation Bureau, Bismarck, for appellee.

MESCHKE, Justice.

Troy Beckler appealed a North Dakota Workers Compensation Bureau decision terminating his disability benefits. The district court affirmed. We hold that the Bureau's pretermination procedures did not accord Beckler due process, and we reverse.

On April 26, 1983, Beckler suffered a work-related injury to his right wrist, initially diagnosed as a severe sprain. The Bureau paid Beckler's medical expenses and paid him disability benefits for one week until he returned to work. During the next two years Beckler continued to experience pain in his wrist. In April 1985, Dr. Miller diagnosed Beckler as having carpal tunnel syndrome. The Bureau accepted Dr. Miller's determination that the 1983 injury caused the carpal tunnel syndrome and continued to pay Beckler's medical expenses, including carpal tunnel release sur-

gery on August 9, 1985. The Bureau also paid disability benefits from August 1, 1985, through February 5, 1986. After surgery, Beckler complained that he continued to have pain, numbness, and abnormal sensations in his right hand.

On January 9, 1986, Dr. Miller examined Beckler and reported "no objective findings of abnormality" and "work simulator therapy suggests his function is good." Dr. Miller's report did not specifically say that Beckler could return to work. At the Bureau's request, Leon Keller, a registered physical therapist, examined Beckler on February 5 and reported that Beckler "was ready to return to work immediately."

After receiving Keller's report, the Bureau informed Beckler on February 12 that the evidence on file established that he was capable of returning to work on February 5 and that the Bureau was terminating his disability benefits effective February 5, 1986.

On March 5, 1986, Beckler consulted Dr. Dahl, whose diagnosis included his impression that Beckler probably suffered from reflex sympathetic dystrophy type syndrome. Dr. Dahl opined that Beckler "should return to work at full time activity," but cautioned that if pain persisted a further opinion might be necessary. On March 10 Beckler asked the Bureau to authorize evaluation by a specialist in pain-induced disability. He also requested reinstatement of disability benefits and determination of permanent partial disability.

On April 1, 1986, the Bureau told Beckler that, based on two medical reports indicating that it would be in his best interest to return to work and use his hand as much as possible, there was no change in its decision to deny him further disability benefits.

On April 2, 1986, Beckler requested a formal hearing and renewed his demand for evaluation by a specialist in pain-induced disability. The Bureau referred Beckler to a neurologist, Dr. Ketroser, for examination on April 23. After reviewing all the medical records, including Dr. Dahl's diagnosis about reflex sympathetic dystrophy type syndrome, Dr. Ketroser reported that Beckler demonstrated a "normal objective evaluation with normal strength, reflexes, and range of motion" but that Beckler described pain in his right hand. Dr. Ketroser did not mention Dr. Dahl's diagnosis. Dr. Ketroser opined that Beckler could "safely perform any and all work activity on a full time basis without restrictions."

On May 17, 1986, Beckler began working with Schaufbauer Construction but on June 16 he quit after experiencing severe pain in his right wrist, requiring treatment at an emergency room. On August 4 Beckler began working part-time with Dependable Business Machines and later became a full-time employee there.

On June 30, 1986, the Bureau issued a written order denying Beckler "benefits over and above those previously awarded and paid" for his injury.[1] Beckler petitioned for rehearing, seeking disability benefits from February 5 through May 17 and from June 16 through August 4. He also renewed his request for evaluation for chronic pain syndrome. The Bureau granted Beckler a formal evidentiary hearing and also suggested that Dr. Ketroser's deposition be taken to clarify whether the pain experienced by Beckler would permit him to work. However, the Bureau denied Beckler's request for an independent evaluation because he had "already been evaluated by a number of physicians with no disagreement about diagnosis."

The Bureau held the evidentiary hearing on December 18, 1986 and on February 10, 1987, formally affirmed its earlier order denying further disability benefits. The district court affirmed the Bureau's decision.

Beckler contends that the Bureau's retroactive termination of disability benefits deprived him of due process under the Fourteenth Amendment of the United States

---

1. In *Lass v. N.D. Workmen's Compensation Bureau*, 415 N.W.2d 796 (N.D.1987), we recently held that similar language did not preclude a subsequent award of benefits based upon a change in a claimant's medical condition.

Constitution and Article 1, Section 12 of the North Dakota Constitution. He argues that he was not given notice and opportunity to be heard before being deprived of a constitutionally protected interest. He thus asserts that he is entitled to disability benefits for those periods that he did not work after February 5, 1986.

The Bureau responds that, pursuant to NDCC 28–32–08,[2] NDAC 92–01–02–03 and 92–01–02–04, and *Davis v. North Dakota Workmen's Compensation Bureau,* 317 N.W.2d 820 (N.D.1982), it may use an "informal hearing" to terminate benefits without providing pretermination notice to the claimant.

NDAC 92–01–02–03 says:

"*Informal hearing.* Upon receipt of a claim, the bureau shall investigate the claim, review the file and make a determination. Such action shall constitute an informal hearing. *Pursuant to North Dakota Century Code section 28–32–08, no notice of such hearing need be given.* Any decision arrived at, as a result of an informal hearing, shall be made pursuant to North Dakota Century Code section 28–32–13." [Emphasis added.]

NDAC 92–01–02–04 says:

"*Rehearing—Formal hearing.* Following an informal hearing, the bureau may set a rehearing on the claim pursuant to North Dakota Century Code section 28–32–14. Such a rehearing shall be a formal hearing on the claim."

In *Steele v. North Dakota Workmen's Compensation Bureau,* 273 N.W.2d 692 (N.D.1978), we held that whenever the Bureau initially disallows a claim after an "informal hearing," the claimant, upon request, is entitled to an evidentiary hearing, whether designated as a formal hearing or rehearing, if there is a dispute about material facts. However, *Steele, supra,* dealt with an initial determination of a claim and not a termination of existing benefits.

In *Davis v. North Dakota Workmen's Compensation Bureau, supra,* the claimant contended that the Bureau improperly denied him a hearing before terminating his benefits. In *Davis* the Bureau made an informal determination pursuant to NDAC 92–01–02–03, and thereafter the claimant chose to appeal rather than request an evidentiary hearing. We held that because the claimant chose to appeal he could not claim he was improperly denied a formal hearing. The claimant did not argue that the Bureau's pretermination procedures denied him due process. *Davis* is therefore not determinative of this case.

The Bureau nevertheless asserts that its pretermination procedures did not deny Beckler due process because he had a subsequent formal hearing and because he could receive retroactive payments, citing *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We disagree.

 The Fourteenth Amendment places procedural constraints on governmental decisions depriving individuals of interests enjoying the status of "property." Protected interests in property derive from an independent source, such as a state statute or rule entitling an individual to benefits. *E.g., Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed. 2d 548 (1972). We think it is clear that, under our state statutes, the continuing right to disability benefits under the Worker's Compensation Act is a "property" right protected by the Due Process Clause.

---

**2.** NDCC 28–32–08, provides:

"*28–32–08. Specifications of any issues to be furnished by agency.*—Whenever an administrative agency, pursuant to authority conferred upon it by law, shall institute an investigation upon its own motion or without the filing of a specified complaint, or shall hold any hearing or make any independent investigation upon the claim or request of any person, no decision shall be made by the agency until all parties in interest shall have been furnished with a written specification of the issues which are to be considered and determined, not until an opportunity shall have been afforded to such parties to present evidence and to be heard upon the precise issues so specified. *Provided, however, that the commissioners of the workmen's compensation bureau may make determinations without the giving of the notice herein provided for.* This provision shall not be construed to relieve the commissioners of the workmen's compensation bureau of the requirements of section 28–32–13 of this chapter." [Emphasis added.]

The Bureau does not contend otherwise. *Cf. Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) [continuing right to Social Security disability benefits is property interest within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment]; *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) [continuing right to welfare benefits is property interest within the meaning of the Due Process Clause of the Fourteenth Amendment].

Our analysis therefore focuses on the process due Beckler before the Bureau may terminate his disability benefits. Due process does not insist upon inflexible procedures uniformly applicable to every imaginable situation. But, minimum components of due process mandate that, except in unusual circumstances, a deprivation of liberty or property be preceded by some form of notice of the contemplated action and an opportunity for a hearing appropriate to the nature of the case. *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Mathews v. Eldridge, supra; Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Goldberg v. Kelly, supra; see* Friendly, "Some Kind of Hearing," 125 U.Pa.L.Rev.1267 (1975).

In *Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33, the United States Supreme Court outlined three factors to be weighed in determining the specific dictates of due process:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

After analyzing those factors, *Mathews* held that an evidentiary hearing was not necessary before terminating Social Security Disability Insurance benefits where there were "elaborate" pretermination procedures and an evidentiary hearing available after termination. *Mathews* distinguished *Goldberg v. Kelly, supra,* which held that due process required an evidentiary hearing before terminating welfare benefits.

First, *Mathews* observed that the need for disability benefits was not as great as the need for welfare benefits because welfare benefits were given to destitute persons on the very margin of subsistence, while disability benefits were not directly based upon financial need. Second, *Mathews* noted that because eligibility for welfare benefits required a wider variety of information and because issues of witness credibility were often critical to the decision-making process, a pretermination evidentiary hearing was necessary to assess that credibility. In contrast, eligibility for disability benefits depended on a medically determinable impairment, a subject more sharply focused and more easily documented than the typical entitlement to welfare. Thus, the potential value of an oral presentation or evidentiary hearing before deprivation of disability benefits was substantially less than in the case of welfare benefits. Third, *Mathews* relied upon additional procedural safeguards against an erroneous decision, already in place for those disability benefits:

> "A further safeguard against mistake is the policy of allowing the disability recipient's representative full access to all information relied upon by the state agency. In addition, prior to the cutoff of benefits the agency informs the recipient of its tentative assessment, the reasons therefor, and provides a summary of the evidence that it considers most relevant. Opportunity is then afforded the recipient to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions. These procedures, again as contrasted with those before the Court in *Goldberg,* enable the recipient to 'mold' his argument to respond to the precise issues which the decisionmaker regards as crucial." *Mathews, supra,* 424 U.S. at

345–346, 96 S.Ct. at 908, 47 L.Ed.2d at 39–40.

Thus, *Mathews* viewed the Social Security Administration's pretermination procedures as important. Those significant procedural safeguards were pretermination notice, a summary of the evidence supporting the proposed termination, and an opportunity to respond. Those minimum pretermination procedures have consistently been called for in the Court's subsequent due process analyses: *e.g., Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Memphis Light, Gas & Water Division v. Craft, supra. See also* Friendly, "Some Kind of Hearing," 125 U.Pa.L.Rev. 1267 (1975). We consider the competing interests in this case within the *Mathews* framework.

■ Continuation of disability benefits is significant to those who are entitled to them. By definition, disability benefits are paid while the claimant is unable to work. NDCC 65–01–02(8). Thus, this private interest is analogous to that involved in *Goldberg* and parallels the interest in employment present in *Cleveland Board of Education v. Loudermill, supra.* Unlike *Loudermill,* where a fired civil service employee could seek employment elsewhere, an employee who is still disabled would be unable to work. *Mathews* tells us that an important factor in weighing the private interest is the length of a possible erroneous deprivation of benefits. In this case, the subsequent evidentiary hearing was more than ten months after the effective date of the termination and the Bureau's formal decision was rendered about one year later. *Compare with Mathews, supra;* and *Loudermill, supra.* We believe that the nature of this private interest, as affected by the length of possible erroneous deprivation of it, demonstrates that it is entitled to minimum procedural protections before it may be terminated.

Analyzing the risk of erroneous deprivation, as designated in the *Mathews* model, we observe that the Bureau's present procedures do not specifically address termination of benefits. *Compare Mathews v. Eldridge, supra.* Rather, the Bureau's procedures broadly address making a determination on a claim and authorize a determination without notice to the claimant. *See* NDCC 28–32–08 and NDAC 92–01–02–03. While we are not called upon to consider whether those "no notice" provisions are sufficient for the initial determination of a claim, they have little relevancy to the retroactive termination of a property interest. At a minimum, prior notice and opportunity to respond are necessary to terminate. *Loudermill, supra; Mathews, supra.*

The Bureau argues that either a return to work or a medical work release can terminate disability benefits. Beckler does not seek disability benefits for times that he worked, so our analysis addresses only a medical work release. The medical documentation needed for a work release here is like that required in *Mathews,* which was partially premised on the reliability of written medical reports. As in *Mathews,* written medical reports militate against requiring a pretermination evidentiary hearing because issues of credibility are usually not involved. *Compare Goldberg, supra.*

However, in this case Dr. Miller's report on January 9, 1986, did not specifically say that Beckler could return to work. While the physical therapist's report said that Beckler was ready to return to work, these medical reports are at best ambiguous, increasing the risk of an erroneous deprivation. That potential is further demonstrated by the Bureau's later willingness to take Dr. Ketroser's deposition to clarify whether the pain [3] experienced by Beckler would permit him to work. The incremental costs of requiring a medical record about a claimant's ability to return to work and of pro-

**3.** In *Kroeplin v. N.D. Workmen's Compensation Bureau,* 415 N.W.2d 807 (N.D. 1987), we recently held that the Workers Compensation Act authorizes a permanent partial impairment award to an injured worker whose impairment was not objectively demonstrable and that the Bureau erred in denying compensation solely because the claimant's impairment was not substantiated by objective medical evidence. *See also, Lyson v. N.D. Workmen's Compensation Bureau,* 129 N.W.2d 351 (N.D.1964).

viding the claimant with an opportunity to respond are not substantial in view of the importance of the private interest, as well as the risk of an erroneous deprivation without such a record and opportunity to respond.

The governmental interest in immediate termination of disability benefits does not outweigh these private interests. Financial cost alone is not paramount in determining whether due process requires a particular procedural safeguard prior to termination, although the government's interest in conserving restricted fiscal and administrative resources must be considered. However, in this case, that incremental cost is outweighed by the significant property interest involved and by the risk of an erroneous deprivation.

■ We hold that the Bureau's procedures denied Beckler due process under the Fourteenth Amendment of the United States Constitution and Article I, § 12 of the North Dakota Constitution. The Bureau's procedures did not give Beckler a pretermination notice that his disability benefits would be terminated, a summary of the medical evidence supporting termination, and an opportunity to respond. *Cf. Baksalary v. Smith,* 579 F.Supp. 218 (E.D. Penn.1984) *appeal dismissed sub nom. Allstate Insurance Co., et al. v. Baksalary,* 469 U.S. 1146, 105 S.Ct. 890, 83 L.Ed. 2d 906 (1985) [automatic supersedeas provision of Pennsylvania Workmen's Compensation act provided no notice until after termination of benefits and deprived claimant of due process]; *Auxier v. Woodward State Hospital–School,* 266 N.W.2d 139 (Iowa 1978), *cert. denied,* 439 U.S. 930, 99 S.Ct. 319, 58 L.Ed.2d 324 (1979) [due process requires Iowa supersedeas provision to provide pretermination notice with reasons for contemplated termination and an opportunity to respond]; *Carr v. SAIF Corp.,* 65 Or.App. 110, 670 P.2d 1037 (1983) [due process requires Oregon Workers' Compensation termination to be preceded

by preliminary notice of proposed cessation and of the evidence upon which the termination is premised as well as the opportunity to respond]; *Mitchell v. State Workmen's Compensation Comm'r,* 163 W.Va. 107, 256 S.E.2d 1 (1979) [due process requires West Virginia Workmen's Compensation termination to be preceded by written notice, an opportunity for the claimant to furnish relevant countervailing information, and an opportunity under the applicable statute to an evidentiary hearing upon timely protest to an adverse order].

■ While Beckler must be accorded an opportunity to respond to the termination of disability benefits, we do not expect a pretermination evidentiary hearing with an occasion to confront witnesses. In our view an evidentiary hearing before termination would unduly burden the governmental interest because medical records will usually resolve whether the claimant can work.[4] Rather, we believe that opportunity to respond should be limited to a written submission as an initial check against an erroneous decision. *See Cleveland Board of Education v. Loudermill, supra; Goss v. Lopez, supra; Mathews, supra.* In this respect our holding rests in part on the Bureau conducting a timely post-termination evidentiary hearing and on the Bureau's authority to award retroactive disability benefits.

Because the Bureau did not provide Beckler with necessary pretermination procedures, we hold that he is entitled to the benefits he seeks. *See Auxier v. Woodward State Hospital School, supra; Carr v. SAIF, supra.* The Bureau's decision denying Beckler disability benefits from February 5, 1986 through May 17, 1986 and from June 16, 1986 through August 14, 1986 is reversed.

LEVINE and GIERKE, JJ., concur.

VANDE WALLE, Justice, concurring in result.

After reading the facts of this case and recognizing the various experts to which

---

**4.** We recognize that there may be a clear conflict in the medical evidence. For example, one doctor may authorize a return to work while a different doctor may not. In such a situation further inquiry and clarification may be necessary to resolve the issue. *See Claim of Bromley,* 304 N.W.2d 412 (N.D.1981).

the Bureau referred Troy Beckler for examination, both at his request and at the Bureau's own instance, it is difficult to conclude that the Bureau denied Troy a fair consideration of his claim. However, the Bureau was aware that Troy was disputing his ability to return to work but it nevertheless terminated Troy's benefits retroactively, i.e., the Bureau notified Troy on February 12 that his benefits were terminated as of February 5. Under these circumstances I agree with the majority opinion insofar as it concludes that procedure denied Troy due process but my concurrence in the result reached by the majority opinion is confined to these circumstances.

Although the Bureau argues that Troy "can show no prejudice to him as a result" of not receiving a notice of termination until several days after benefits had terminated, that argument is not persuasive. I suggest that it should be the Bureau which must show the lack of prejudice. The Bureau also argues that in most cases disability benefits will terminate when a claimant is given a full work release, and to require that a notice be given, or a hearing held, will result in additional benefits being granted despite evidence that they are no longer warranted. However, where, as here, the Bureau was aware that the claimant contended he could not work and requested an evaluation by a specialist in pain-induced disability [I do not concede that the Bureau was required to authorize such an evaluation in view of the other examinations authorized by the Bureau], I believe a notice should have been given prior to termination of the benefits. It is possible that such a requirement would lead to the payment of more benefits than are ultimately determined necessary, but the Bureau may adapt its procedures to hold any excess payment to a minimum.

ERICKSTAD, C.J., concurs.